UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| United States of America, | : | Case No. 1:10-CR-098 |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | |
| | : | |
| Nancy Sadler, et. al., | : | |
| | : | |
| Defendants. | : | |

**ORDER**

Before the Court are two motions to suppress evidence, one filed by Defendant Brenda Banks (Doc. 122), and a joint motion by Nancy Sadler, Lester Sadler, and Sandy Wells. (Doc. 127) Both motions seek to suppress certain evidence seized pursuant to a search warrant executed at the premises located at 850 Emmit Avenue, Suite 5, Waverly, Ohio. The Sadlers also seek suppression of evidence seized pursuant to a warrant for 1839 Pershing Avenue, West Portsmouth, Ohio.

The Court held an evidentiary hearing concerning both motions on December 12 and 13, 2011. At the start of the hearing, Ms. Wells withdrew her motion. (TR 1, Dec. 12, 2011 at 5) The remaining moving parties and the Government have submitted post-hearing briefs (Docs. 153 and 155), and the matter is ripe for decision.

**FACTUAL BACKGROUND**

The two warrants in question were issued during a larger

-1-

investigation conducted by the Government into unlawful distribution of controlled substances in the eastern part of Ohio.  As detailed in the affidavits of DEA Diversion Investigator Kresnak which are attached to each of the search warrants (Government Hearing Exs. 1 and 4), the investigation focused on distribution of controlled substances, particularly hydrocodone and oxycodone, by several "pain clinics" and physicians and individuals associated with the clinics.

Ohio Medical and Pain Management operated out of Suite 5 at the Emmit Avenue location in Waverly, Ohio.  Lester Sadler is listed on corporate records as the owner of this business, and Nancy Sadler and Brenda Banks (a physician) were employed there. Lester and Nancy Sadler also either owned or leased the adjoining suites, Nos. 4 and 6.  At the time of the search, Suite 4 was vacant or perhaps used by the Sadlers or the clinic to store and/or copy records.  Suite 6 had been a pizzeria at one time, and the door still carried a pizzeria sign.  Suite 6 was being used by the clinic to store records and as an employee break room.  Ohio Medical and Pain Management listed its official corporate address as 1839 Pershing Avenue.  Lester and Nancy Sadler used that address over the years for personal reasons.

None of the Defendants' written motions challenged probable cause for issuance of the warrants.  With regard to 850 Emmit Avenue, Defendants contend that the agents entered Suites 4

-2-

and/or 6 during the search of Suite 5, and/or ordered clinic employees Sandy Wells and Gidget Coleman to retrieve records from those suites and turn them over to the Government. The moving Defendants argue that the scope of the search improperly exceeded the terms of the warrant, which was limited to Suite 5.

With regard to Pershing Avenue, the Sadlers contend that agents improperly searched and seized materials from two different addresses - 1833 and 1839 Pershing Avenue, while the warrant only authorized a search of 1839 Pershing. They also allege that the officers did not provide them with a copy of the warrant at the time of the search.

The Emmit Avenue Search

Special Agent Rex Smith was in charge of the execution of both search warrants; Agent Smith has since passed away. Diversion Investigator Kresnak testified at the hearing that he was present during the Emmit Avenue search, accompanied by a group of assisting officers and agents. Dr. Banks was at the clinic when Special Agent Smith entered the premises, and Smith presented her with the warrant. Agent Smith told Kresnak (who held a brief meeting with the other officers in the parking lot while Smith initially entered the clinic) that clinic employees were secured in Suite 6, the former pizzeria. There were no interior doors between Suites 4, 5 and 6, and the only manner of ingress and egress into each separate suite was through the

-3-

exterior entrance doors to each one.  Kresnak testified that
Sandy Wells was in Suite 6 with other employees.

Kresnak was particularly looking for patient files for
approximately 300 individuals.  He had their names on a list he
obtained from a database of information about the amount of
controlled substances that had been prescribed to these
individuals over a period of time.  Kresnak testified that he and
the officers assisting him were able to find many of those files
in Suite 5, but could not find a group of approximately 50 files.
He asked Wells where patient files would be kept, the files he
testified he could not find within "the suite itself, the clinic,
either in an examination room or in the records room."  (TR 1 at
16)  Wells told him she either knew where those files were, or
that she would go and look for them.  She returned with some
records, but Kresnak could not identify exactly where Wells had
found them.  Kresnak also asked clinic employee Gidget Coleman to
help locate patient files; another officer (Agent Younker) went
with Coleman to find additional files.  Kresnak was unsure where
she found the records she brought to Kresnak.  He admitted these
records may have been found outside of Suite 5.  (TR 1 at 17)

The DEA receipt forms filled out at the time of the search,
identifying the property and items seized, include one sheet
listing "three boxes of patient records brought by G. Coleman."
This receipt is signed by Agent Frank Younker and by Dr. Banks.

-4-

Another receipt identifies two boxes of "patient records brought by S. Wells," and is signed by Investigator Kresnak and Dr. Banks.  (These receipts are included in Government Hearing Exhibits 1 and 2.)  Investigator Kresnak testified that he personally placed the files found by Sandy Wells and Gidget Coleman into separate DEA evidence boxes, and wrote on the outside of those boxes the name of the employee who had brought him those files.  He freely admitted that he could not say with certainty whether those files came from Suite 4, 5 or 6.  (TR 1 at 55)  Other receipts completed on the day of the search for patient files seized from the clinic are also included in Exhibits 1 and 2.  Some of these include a list of specific patient names and an indication of where the particular files were found (e.g., "Office #2," "Office #1 (Dr. Banks' Office)" or "Recept/file").  One receipt identifies sixteen boxes of patient records but does not indicate a specific clinic location where they were found.

On or about February 26, 2008, Investigator Kresnak and Agent Younker signed a formal requisition listing the materials seized during the search. (Government Hearing Exhibit 3)  This requisition is prepared and used to place the evidence into a secure locker.  Exhibits N-64, N-65 and N-66 listed on that requisition are the boxes labeled as "Patient Records found by Gidget Coleman," and Exhibit N-68 as "Patient Records found by

-5-

Sandy Wells." Later on in the case, Investigator Kresnak prepared a spreadsheet for use by the attorneys that lists each of the exhibits by number and details the contents of each box. (Government Exhibit 8) Boxes N-64, N-65, N-66 and N-68 contain a total of 52 individual patient files.

Sandy Wells did not testify at the hearing. Gidget Coleman (n/k/a Gidget Odle) testified that she was present when the search team arrived at the clinic, and that she met Investigator Kresnak at that time. She did not remember being asked by Kresnak or any other officer to retrieve files, to point out files, nor did she recall discussing patient files with any of the officers. She did not remember seeing Sandy Wells at the clinic during the execution of the warrant. (TR 2 at 10-11) Ms. Odle invoked the Fifth Amendment in response to most of the questions asked of her on cross-examination, on advice of counsel.

After the hearing, Investigator Kresnak discovered that there was another box of patient files stored in the evidence locker that was also labeled "Patient Records found by Sandy Wells." This box is labeled as N-53 on the evidence inventory, Government Ex. 8, and contains nine patient files. As a result of this confusion, and the frank admission by Investigator Kresnak that some of the files may have been retrieved from Suites 4 or 6, the Government offered to stipulate that it would

-6-

not use any of the hard-copy patient files seized during the search.  (See Doc. 148, Government's motion to correct the record.)

In their post-hearing brief, the moving Defendants contend that **all** evidence seized during the search must be suppressed because (they argue) the officers "clearly and flagrantly exceeded the scope of the warrant, and then further compounded their malfeasance by commingling the properly and improperly seized evidence, making it impossible for this Court to discern the source of the evidence the Government now wishes to use at trial."  (Doc. 155 at 3)

The 1839 Pershing Avenue Search

Investigator Kresnak was not personally present when this search was conducted, as Agent Smith was the supervising agent on the scene.  The investigation had yielded significant evidence that Lester and Nancy Sadler both used 1839 Pershing Avenue as their personal address for various reasons (including bank accounts, driver's licenses and car titles, and on pay stubs and W-2 forms).  Lester Sadler was registered as the official agent for Ohio Medical and Pain Management, LLC, also at the same address.  Invoices from pharmaceutical suppliers to Ohio Medical and Pain Management were sent to 1839 Pershing Avenue.  (See Government Hearing Exhibit 9)

Investigator Kresnak testified that prior to obtaining the

-7-

warrant, he and Agent Smith had observed the Pershing Avenue property, and he checked the county auditor's records for that address. Based on his observations and the information he obtained from the auditor, Kresnak described the property in Paragraph 43 of his warrant affidavit as a vacant lot, with an entrance and exit drive for the corporate offices of Ohio Medical and Pain Management. He further averred that the property

> ... contains a building on east side of the
> drive described as single story structure
> yellow color siding with dark brown roof with
> a dark brown in color door in front with an
> open sided carport located on the east side
> of the structure. A second structure located
> just west of the first is a barn like
> structure red and white in color containing
> several 'home' like windows with a red roof.
> Two stories with the first story being a two
> bay garage with red doors.

(Government Ex. 4, Kresnak Aff. at ¶43) There were also several outbuildings and trailers located on the property.

While Investigator Kresnak was not present during the search, he later reviewed the materials that were seized. He observed that the documents found on the premises were in a chaotic state, with various types of records commingled in plastic storage bins. In some cases, descriptions written on the outside of the bins did not match the contents.

Officer Michael Mann, former DEA task force officer (and now retired), also testified at the hearing. He was present for the search at Pershing Avenue. He explained that the officers

-8-

divided into two teams because the location (1839 Pershing) had two residences, and a team was assigned to each one. Prior to the search, Agent Smith held a meeting with all team members at the local Sheriff's office. Smith read the search warrant to the team, and Mann was given a copy of it to take with him. He was also given a copy of the list of items to be seized during the search. During that pre-search meeting, Agent Smith described the layout of the premises and displayed a Google earth overhead view of the property.

Officer Mann was on the team assigned to the lower residence, while Agent Smith was in charge of the upper residence. When Mann entered the house, he found an individual later identified as Fortune Williams. Officer Mann read the warrant to Williams. Later on, an individual named Nancy Crowder was escorted from the upper residence to the lower residence to help the officers secure some wolves that were kept in the lower residence. After a brief search outside of the residence and some surrounding outbuildings to secure the premises, Mann testified that the officers found most of the materials listed in the warrant in the basement of the residence, where approximately 35 boxes and plastic tubs of documents and evidence were found and removed. Mann filled out a DEA receipt form listing the materials taken from the lower residence, and left a copy on the coffee table. (Government Ex. 5) When the other team had

-9-

completed the search of the upper residence, Mann reviewed the items taken and countersigned the DEA receipt forms for those materials. Mann saw Agent Smith take copies of those receipts with him when he went back into the upper residence, where some individuals were still present. Agent Smith was the last officer to leave that residence after the search was completed.

Defendants' investigator, Ms. Beyersdoerfer, performed additional research into Scioto County land records. She testified that her research revealed that the Pershing Avenue property was part of a larger plot of land that was subdivided in the early part of the 20th century. (See Def. Hearing Exhibit A) Lot 13 and Lot 14 of the Beekman Heights subdivision are adjoining lots; Lot 13 is formally designated as 1833 Pershing Avenue, while Lot 14 is designated as 1839 Pershing Avenue. Ms. Beyersdoerfer obtained certified copies of property cards listing the owner and the owner's address for each of the lots. The cards also identify some of the historical land transfers. Def. Hearing Exhibit C is the property card for Lot 13, 1833 Pershing, and Exhibit D is for Lot 14, 1839 Pershing. Both cards, which were created sometime prior to July 1995, list the same couple as owners of both lots, and both cards list the owners' official address as 1839 Pershing. These property cards also show that ownership of both lots was transferred on the same dates to the same individuals in 1995, 1997 and 1998. Lot 13's card has no

-10-

indication of any building located on the property, but Lot 14's card describes a single-family house with a basement located on that lot.

Ms. Beyersdoerfer also obtained certified copies of more recent property cards for both lots, which identify Lester and Nancy Sadler as owners of both lots, with the same conveyance date for both of September 29, 1999. The card for Lot 13 (1833 Pershing) has a note stating that "House goes on Parcel No. 27-1642," which is the official parcel number for 1833 Pershing. The card for Lot 14 (1839 Pershing) has a note stating "House goes on Parcel 27-1267" which is not the parcel number for either Lot 13 or Lot 14. Both cards state that the current "improvement" value on the land is zero, and all auditor records admitted at the hearing describe the "property type" as vacant land.

Ms. Beyersdoerfer confirmed Investigator Kresnak's testimony that the property has a common driveway that runs between the two residence structures, and that the driveway is not shared by any other parcel or neighbor. There is only one mailbox at the end of the driveway at Pershing Avenue which carries the number "1839." She also confirmed that the post office has only one mailing address for the entire parcel, which is 1839 Pershing Avenue.

Despite the Sadlers' earlier concession that they were not

-11-

challenging probable cause for the Pershing Avenue search, their post-hearing brief does just that. They argue that Investigator Kresnak's affidavit was deficient because it included information from two unnamed employees of the clinic, who told Kresnak that Nancy Sadler took drugs out of the clinic for personal use, and removed medical records. The Sadlers now contend that Kresnak did not provide information establishing the reliability of the "unnamed informants," and did not provide any independent corroboration of the informants' allegations. Therefore, they now argue that the warrant was not supported by probable cause, and all evidence seized from Pershing Avenue must be suppressed.

### ANALYSIS

The Fourth Amendment generally requires suppression of evidence secured during an illegal search. To pass constitutional muster, a search warrant must describe the premises to be searched and the materials to be seized with particularity. United States v. Gahagan, 865 F.2d 1490, 1495-96 (6th Cir. 1989); United States v. King, 227 F.3d 732, 750 (6th Cir. 2000).

### I.   Scope of the Emmit Avenue Search

Defendants argued in their motion that the patient files retrieved by Sandy Wells and Gidget Coleman (Odle), and a number of blank prescription forms, should be suppressed because they were not taken from Suite 5. The Government initially responded

by stating that the 52 files retrieved by the employees (and contained in Exhibits N-64, 65, 66 and 68) would not be used by the Government.  The blank prescription forms (described on the Government's evidence sheet as Exhibit N-145) were not seized during the search, but had been obtained several months later from a witness who was interviewed during the investigation. (See Doc. 138)  Defendants have nothing to contradict Investigator Kresnak's testimony that the blank prescriptions forms were not seized during the search.

As noted above, following the hearing the Government has stated that it will not use **any** of the hardcopy patient files seized during the search.  Those files were the focus of Defendants' written motion and testimony at the hearing.  In response to the Government's offer, Defendants now contend that **all** of the evidence seized from Emmit Avenue must be suppressed, especially the computers that apparently contain patient files. Defendants' post-hearing brief contends that upon the officers' arrival at the clinic, "it became apparent that the business had overflowed into and was utilizing Units 4 and 6.  There were large quantities of documents and evidence being stored outside of Unit 5.  It appeared to law enforcement that there was a free flowing access between the three units that permitted the employees to move between them through the course of the business day."  (Doc. 155 at 2)

-13-

The transcript excerpts cited by Defendants include testimony that when Investigator Kresnak entered Unit 5, Agent Smith told him that employees were in Unit 6; he recalled they were either on breaks or having lunch.  Agent Smith then told Kresnak that he had placed the employees in Unit 6, and Kresnak entered Unit 6 and saw the employees there.  He saw many medical files in Unit 6 when he entered, and he knew that two local law enforcement officers remained in Unit 6 with the employees. However, Kresnak **denied** defense counsel's suggestion that there were "numerous agents in and out of that unit throughout the day..." as Kresnak went in only briefly to see who and what was there.  Defense counsel then stated that "it sounds like a free flow back and forth... agents would have been through and within both units, correct?"  Kresnak responded that there were a lot of agents in Unit 5, and he could not state whether or not "all of us went through [Unit 6] at one time or another."  Kresnak confirmed that he and Agent Smith had initially been in Unit 6, along with the two uniformed officers.  (TR 1 at 73-75)

With regard to Defendants' contention that "large quantities of documents and evidence" were in the adjoining units, Investigator Kresnak testified that someone told him the clinic "did a lot of copying" in Unit 4.  Kresnak never entered that unit, and the only copier and fax machine he saw was in the reception area for Unit 5.  (TR 1 at 92-93)  Officer Mann

-14-

testified on direct that he followed Gidget Coleman into Unit 6 to retrieve some of the patient files that Kresnak asked her to find.  On cross, Mann confirmed that the three units adjoined each other, and their outside entrance doors were fairly close together, "... a short distance, easy access, you just followed the employee."  (TR 2 at 44-45)  He agreed that there appeared to be "a very sort of joint usage going on.  They were using one for file storage, they were using one at the very least for a break area."  He described it as "those units were free flowing to one another and the employees had access to, if they chose to, ... whenever they wanted to.  That was just my impression."  (TR 2 at 46)

Defendants cite this testimony to assert that the Government cannot determine or prove what materials seized were located within Suite 5 and within the two other suites, an assertion now going beyond the patient files that were the focus of the original motion and the hearing.  (Doc. 155 at 3)  They argue that blanket suppression, admittedly a harsh remedy, is required because the searching officers flagrantly disregarded the warrant in their search for evidence, and then commingled properly and improperly seized materials.  The Court disagrees.

Whether or not clinic employees may have had "free flowing" access to all three of the units during clinic operations, as Officer Mann believed, Investigator Kresnak expressly testified

-15-

that he did not send any officers into the pizzeria or into Unit 4 to search for documents even though he had seen a large quantity of medical files in the pizzeria.  Furthermore, he testified that some of his agents asked if they should search through the documents and records that were seen in the pizzeria, and Kresnak instructed them to "Search Suite 5."  Kresnak confirmed that the search was limited to Suite 5, with the exception of the patient files retrieved by Wells and Coleman. (TR 1 at 102-103)

The DEA Form 12's prepared during the search that describe the materials seized from Suite 5 confirm Kresnak's testimony, and belie Defendants' suggestion that the team of officers flagrantly disregarded the warrant, or commingled evidence haphazardly gathered from all three units.  A total of 16 separate receipts were completed, and with the exception of forms completed for some of the patient files, each of them adequately discloses the location within Suite 5 in which the materials were found.  The seven receipts included in Government Exhibit 1 identify papers and a notebook found in the "receptionist area;" records found in Dr. Banks' Office, Office #1, including four identified patient files; materials taken from the "safe room" including computer CDs, indices of patient records, and controlled substances; miscellaneous papers found in the "receptionist area;" materials found in "Office 2;" and the form

-16-

listing three boxes of patient records brought by G. Coleman, and one listing sixteen boxes of patient records.  The nine DEA-12's that comprise Government Exhibit 2 describe currency taken from "front desk;" one box of patient records, location not identified; a list of materials taken from the front desk area, including 2 "emachines," dispensing and appointment logs, and miscellaneous documents; a sheet listing five identified patient files and miscellaneous papers taken from the "Recept/File;" a pre-signed prescription form found in the receptionist area; 14 specific patient records and miscellaneous papers taken from the "Recept/File;" two boxes of records found by Sandy Wells; EMSP Related Files and documents found in the "Receptionist area and Gidgets Desk Drawer;" and miscellaneous patient records found in Office #2.  Each of these receipts was signed by Dr. Banks.

Defendants' post-hearing brief focuses on the two computers (the "Emachines" listed on page 3 of Government Exhibit 2), arguing that the specific location from which they were seized is not written on the form.  The rest of the materials described on this sheet clearly identify the items that were found in or around the "front desk" of the clinic.  This fact, combined with Investigator Kresnak's testimony, amply support the conclusion that the computers were also found there.  There are no facts and no testimony that could support a reasonable inference, much less a firm conclusion, that those computers were found somewhere

-17-

else.  Defendants accuse the Government of failing to offer
testimony at the hearing about the specific location of the
computers.  But it is evident to the Court that the entire focus
of Defendants' challenge to the warrant at the hearing was the
patient files, and there was no issue directly raised about any
other evidence.  At best, during cross-examination, Investigator
Kresnak was asked if he could tell from Government Ex. 8, the
"master" inventory of evidence, what items he personally seized
or what parts of the clinic he personally searched.  He responded
that he could not answer such a question without referring to his
notes or examining the actual evidence bags.  (TR 1 at 87-89)
This is hardly evidence of a haphazard and overly broad search
throughout all three units.  The actual receipts completed on-
site are sufficient to overcome Defendants' suggestions to the
contrary.

Defendants cite <u>United States v. Foster</u>, 100 F.3d 846 (10th
Cir. 1996) to argue that blanket suppression is the appropriate
remedy here.  There, the search warrant for defendant's home
identified four firearms and marijuana as the only items to be
seized.  The searching team (comprised of DEA agents and county
sheriff's deputies) seized those items along with tools,
televisions, a lawnmower, clothes, knives, jewelry, and "anything
of value" seen in the home.  One of the deputies admitted this
was standard practice in the county, and that the officers took

anything they believed might provide evidence of additional crimes. The district court granted suppression of the evidence, which the Tenth Circuit affirmed, finding that the officers flagrantly disregarded the specific terms of the warrant. The facts of <u>Foster</u> are not even remotely close to the facts concerning the Emmit Avenue search.

In sum, the Court finds that none of the searching officers flagrantly disregarded the warrant or its terms when conducting the Emmit Avenue search. Defendants' motion to suppress the evidence seized from that location is denied, except with respect to the hardcopy patient files that cannot be determined to have been found in Unit 5. These include the files found by Sandy Wells and Gidget Coleman (described in Government Ex. 2 at p. 7 and Ex. 1 at p. 9); the sixteen boxes listed on the receipt attached to Ex. 1 at p. 11; and the box identified on the receipt attached to Ex. 2 at p. 2. The files that are specifically listed on the other receipts with a location in which they were found may be used, if the Government wishes to do so.

II.  <u>The Pershing Avenue Search Warrant</u>

In their written motion, the Sadlers contended that the searching agents did not have the warrant with them at the time of the search, and that they therefore seized materials not specifically described in the warrant. They also suggested that the agents searched the "wrong" address but did not explain their

argument in any detail.  As described above, they presented
testimony at the hearing that the agents may have also searched
property legally described as 1833 Pershing.  No one who resided
at either of the residences and was present at the time of the
search testified concerning the alleged absence of a warrant.

Officer Mann, who was in charge of the lower residence
search team, had a copy of the warrant with him when he entered
the home.  He read the warrant to the individual he found there,
and he left a copy of the inventory of materials seized from that
residence in the home when he left.  With regard to the upper
residence, Officer Mann knew Agent Smith had a copy of the
warrant just before they arrived at the property because Smith
had read it to the search team before they arrived, and had given
a copy to Mann.  Mann countersigned Smith's inventory of
materials seized, and saw Smith re-enter the home with a copy of
the inventory in his hand.  Investigator Kresnak testified that
he had participated in executing other search warrants with Agent
Smith, and that he had "never known him to fail" to follow his
routine practice of giving a copy of the warrant to the person on
the premises.  (TR 1 at 104) In the absence of any testimony or
evidence that the warrant was not presented to whomever was in
the upper residence at the time, the Court finds this evidence
sufficient to support the conclusion that Agent Smith followed
his normal practice and presented the warrant.

-20-

Even if he did not do so, however, the Sadlers admit that
the requirement of Fed. R. Crim. P. 41(f)(1)(C), to provide a
copy of the warrant and a receipt for seized property, is not
normally of constitutional import.  The Sadlers cite <u>United
States v. Searp</u>, 586 F.2d 1117 (6th Cir. 1978), which held that a
violation of Rule 41 **may** require suppression of evidence when a
defendant can show prejudice (typically in the form of an unduly
enlarged or "abrasive" search), or when there is a suggestion
that the officer intentionally disregarded a defendant's rights.
In that case, an arrest warrant had been issued for Mr. Searp in
connection with several armed robberies.  The agents went to his
mother's home where he frequently stayed to arrest him, but he
was not there and his mother refused to consent to a search of
the house.  The agents quickly obtained a search warrant at 11:30
p.m. the same night from a state court county judge, who used a
preprinted state warrant form that commanded an "immediate"
search of the house.  The warrant was promptly executed, and the
search spanned several early morning hours.

Searp later moved to suppress the search because Rule 41
requires that a search be conducted during the daytime, unless
reasonable cause is shown to a magistrate who authorizes a
nighttime search.  The Sixth Circuit found that there was no
information contained in the warrant application justifying an
intrusive, late-night search of the mother's house, especially

-21-

because she was not suspected of any criminal involvement. However, the Court also found that exclusion of the evidence was not warranted because the search was "reasonable" in the constitutional sense.  The mother had been warned that the agents wanted to search the house looking for evidence against her son, and the exigency of the situation supported an immediate search. The search was conducted pursuant to a valid warrant that satisfied the Fourth Amendment, and the rule violation did not require the constitutional remedy of suppression.  Id. at 1122.

Here, the testimony is unrefuted that Officer Mann left a copy of the warrant in the lower residence, and there is no testimony that Agent Smith failed or refused to leave a copy in the upper residence.  The Sadlers have not established any basis to conclude that the daytime search at Pershing Avenue was "unnecessarily abrasive" or harsh.  A certain degree of obtrusiveness and subjective upset is likely to result from the search of any home.  But there is not a scintilla of evidence suggesting that the searching officers intentionally disregarded the Sadlers' rights.

The Sadlers' written motion also suggested that some evidence seized during the search was not covered by the warrant. As Investigator Kresnak testified, the papers and documents were found in plastic tubs and were disorganized, with papers commingled and tubs mislabeled.  The warrant's description of

-22-

items to be seized included records concerning indicia of
occupancy or residency; log books and other records concerning
controlled substances (including transporting, ordering,
purchasing, processing, storing, secreting and distributing); tax
records for the years 2000 to the present; papers and other
documents concerning travel; address and telephone books; a broad
category of financial records and documents; and medical records.
Officer Mann testified that Agent Smith came to the lower
residence, looked at the tubs of documents the officers found in
the basement, and instructed them on what materials he believed
were pertinent to his investigation.  While the Sadlers have
identified a few items (rolling papers, for instance) that
arguably did not fall within the scope of the warrant, the Court
finds that any over-inclusiveness at the time of the search was
the result of the disorganized state in which pertinent records
and materials were found, and not due to any misconduct of the
officers or their disregard of the scope of the warrant.

III. Probable Cause for the Pershing Avenue Warrant

As noted above, the Sadlers belatedly argue that probable
cause was lacking for the Pershing Avenue warrant because
Investigator Kresnak failed to provide corroborating information
about "confidential informants."

Probable cause supporting a search warrant is a "practical,
non-technical conception" that deals with the "factual and

-23-

practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Illinois v. Gates, 462 U.S. 213, 231 (1983).  The Sixth Circuit has stated in this regard:

> In determining whether the officer's affidavit establishes probable cause, the task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, ... there is a fair probability that contraband or evidence of a crime will be found in a particular place.  And the duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed.

United States v. Carpenter, 360 F.3d 591, 594 (6th Cir. 2004) (en banc), quoting Illinois v. Gates, 462 U.S. at 238-39 (internal quotations omitted).  "To justify a search, the circumstances must indicate why evidence of illegal activity will be found in a particular place.  There must, in other words, be a nexus between the place to be searched and the evidence sought." Carpenter, 360 F.3d at 594 (internal citations and quotations omitted).

Investigator Kresnak's affidavit for the Pershing Avenue warrant sets forth in detail the facts gathered during his investigation, including calls from and interviews with several pharmacists who complained to the DEA about Dr. Banks' prescribing practices, using prescriptions from the Sadlers' clinic.  One pharmacist in Russell, Kentucky was indicted in November 2006 on multiple counts of distributing controlled substances directly related to prescriptions written by Dr.

-24-

Banks. DEA databases revealed that between October 2003 and
August 2007, Dr. Banks used or "allowed her DEA registration
number to be used" for ordering over 200,000 dosage units of
hydrocodone. During Kresnak's interview with Banks in December
2007, she said she had a contract with the Sadlers, whom she
described as the clinic owners. Health Solution Plus, LLC, had
operated at the Emmit Avenue location, and Lester Sadler was an
owner of that business. Lester Sadler was also the agent for
Ohio Medical and Pain Management, LLC, and both companies used
1839 Pershing Avenue as their official address. Banks also
admitted to Kresnak that she did not order controlled substances
for the clinic, and believed that someone else in the office did
so. Federal law cited in the affidavit requires that records of
controlled substance purchases be maintained for a period of two
years from purchase, including invoices and packing slips, at the
registrant's premises unless DEA has approved another site. One
example of an alternate site would be corporate headquarters.
Lester Sadler used checks with the 1839 Pershing Avenue address
to pay drug distributors, and invoices were sent to that address.

After describing the premises known as 1839 Pershing Avenue,
containing the corporate office and residence of the Sadlers, his
affidavit stated that he interviewed "an employee of the clinic"
who told him that "he/she is aware of instances where the Sadlers
have removed controlled substances from the clinic for personal

-25-

use." (Aff. at ¶23)  Nancy Sadler, a convicted felon, was confirmed to be an employee of the clinic.  Another employee (David Journey), also a convicted felon, was prescribed excessive amounts of oxycodone by Banks over an eleven-month period.  In paragraphs 36 and 37, Kresnak related information obtained during an interview with another clinic employee, who told Kresnak that he and his wife both had criminal histories involving controlled substances, and that they had both worked for the Sadlers.  Yet the records provided by the clinic in response to a grand jury subpoena seeking employee information failed to disclose these two individuals' employment.  The same employee said that he and his wife had been with the Sadlers after hours, and saw Nancy Sadler take "Lorcet" pills from the clinic that were then mis-used by all four of them.  Finally, the same employee told Kresnak that Nancy Sadler took controlled substances home from the clinic, and took medical records home with her for transcription. (¶¶ 39, 40)

It is evident to the Court that the information provided by these "informants" was but a small part of the totality of the circumstances Investigator Kresnak detailed in his affidavit about the ongoing investigation into Banks and the Sadlers.  The Sadlers cite <u>United States v. Frazer</u>, 423 F.3d 526 (6th Cir. 2005), where the Sixth Circuit found a lack of probable cause in an affidavit which was based "almost exclusively on the

-26-

uncorroborated testimony of unproven confidential informants (none of whom witnessed illegal activity on the premises of the proposed search)...". <u>Id</u>. at 533.  The court noted that no information had been provided in the affidavit about the sources' veracity, reliability, or the basis of their knowledge about the object of the search.  Here, in contrast, Kresnak's affidavit contained a significant amount of information that did not come from informants, information he gathered and verified during his investigation.  It also contained his observations based on his long experience about where relevant records of drug distribution are likely to be found.  While the employees described in the affidavit are not named, there is a clear identification of the basis of their knowledge about the Sadlers: all of them were employees at the clinic.  Moreover, Banks told Kresnak that she did not order drugs for the clinic and therefore she did not keep the required records there.  The Sadlers used 1839 Pershing Avenue as the official address of the two LLCs, and that address appeared on invoices from and checks payable to the drug distributor.[1]

Even if the relatively small amount of information Kresnak

_____

[1] As was noted in <u>United States v. Abboud</u>, 438 F.3d 554, 571 (6th Cir. 2006), "One does not need Supreme Court precedent to support the simple fact that records of illegal business activity are usually kept at either a business location or at the defendant's home."  Here, the business and the home were one and the same.

received from the unnamed employees is set aside, this Court has
no trouble concluding that the affidavit was more than sufficient
to enable the magistrate judge to make the "practical, common-
sense decision" that the circumstances presented a fair
probability that evidence of a crime would be found at 1839
Pershing Avenue.  The Sadlers' belated probable cause challenge
is rejected.

IV.   1833 Pershing Avenue

     The Sadlers contend that the agents improperly searched 1833
Pershing Avenue, property that was not within the scope of the
warrant for 1839 Pershing Avenue.

     The record establishes that Investigator Kresnak's warrant
affidavit particularly and accurately described the premises to
be searched.  Ms. Beyersdoerfer agreed that his description
matched her own observation of the premises.  There is no
evidence that the number 1833 was displayed on a mailbox or on
either of the houses that were searched.  The mailing address for
the parcel legally identified as 1833 Pershing is 1839 Pershing,
the address on the warrant.  The information Kresnak obtained
from the county auditor's office concerning 1839 Pershing Avenue
did not raise a question about whether there were two legally
distinct residences at that address.  The warrant correctly
identified the premises as the corporate office for Ohio Medical
and Pain Management, located at 1839 Pershing, and the Sadlers do

not contest the fact that the address was used as the corporate address. There is no evidence or testimony suggesting that when the officers arrived on the premises, anyone pointed out to them that 1833 Pershing was legally or factually separate and distinct from 1839 Pershing. Rather, all of the facts adduced prior to the search would support an officer's reasonable assumption that "1839 Pershing Avenue" was exactly as described in Kresnak's affidavit – a parcel of land with one driveway that ran between two separate residences and containing a number of outbuildings. The Court finds that nothing about the appearance of the premises or the information available to and in possession of the Government at the time of the search would support a finding that the officers intentionally exceeded the scope of the warrant.

V.    Leon Exception

Even if an error of constitutional magnitude occurred with respect to the Pershing Avenue warrant and/or search, the Court also concludes that the good faith exception established by United States v. Leon, 468 U.S. 897 (1984) applies. Leon modified the Fourth Amendment's exclusionary rule to permit the admission of evidence seized based upon an officer's reasonable, good-faith reliance on a search warrant, even when the warrant is subsequently held to be constitutionally defective.

Leon identified four situations in which deference to the findings and conclusions of the magistrate judge is not

-29-

warranted.  First, when knowing or recklessly false statements
were made in the affidavit supporting the warrant.  Second, the
courts must insist that the magistrate judge "perform his neutral
and detached function and not serve merely as a rubber stamp for
the police."  Id. at 914 (internal quotation and citation
omitted).  Third, no deference is warranted when an affidavit
does not provide a substantial basis for a finding of probable
cause.  And fourth, the warrant cannot be so facially deficient
that a reasonable officer could not objectively and reasonably
rely upon its presumed validity.  See United States v. Moore, 661
F.3d 309, 2011 U.S. App. LEXIS 23344 at **12-14 (6th Cir., Nov.
22, 2011), finding that Leon applied to evidence seized pursuant
to a warrant that the government conceded was "minimal" in
several important respects.

     None of the Leon factors come into play in this case.  There
is no argument, much less any evidence, that anything in
Investigator Kresnak's affidavit was knowingly false, or that he
recklessly disregarded the truth of any information contained in
his affidavit.  The affidavit was particularized and specific in
describing the background to the investigation, the information
obtained about the alarming amounts of controlled substances
distributed through the Sadlers' clinic, and in its description
of the physical layout of the premises to be searched.  There is
no evidence suggesting that Magistrate Judge Black, who signed

-30-

the warrant, was simply acting as a "rubber stamp" for the Government or the DEA rather than performing as a neutral magistrate. It is the defendants' burden to come forward with proof of such an assertion in any event. <u>United States v. Frazier</u>, 423 F.3d at 537, citing <u>United States v. Rodriquez-Suazo</u>, 346 F.3d 637, 649 (6th Cir. 2003). The Court has already concluded that Kresnak's affidavit provided a substantial basis for finding probable cause to search the Pershing Avenue premises. Finally, the Court cannot conclude that the warrant is facially invalid, or that there was anything in the affidavit or on the face of the warrant that a police officer could not reasonably and objectively rely upon in assuming that it was valid and constitutional. For these reasons as well, the Court rejects the Sadlers' motion to suppress evidence seized from the Pershing Avenue property.

VI. <u>Dr. Banks' Standing</u>

The Government initially challenged Dr. Banks' standing to seek suppression of evidence seized from Suites 4 or 6 at the Emmit Avenue premises, because she lacked a legitimate expectation of privacy in those locations. The Court's conclusion that the Government may not use any of the hardcopy patient files seized, which would include any materials that may have been found in those adjoining suites, moots this argument and the Court need not address it at this juncture.

-31-

**CONCLUSION**

For all of the foregoing reasons, the motion to suppress filed by Brenda Banks (Doc. 122), and the motion to suppress filed by Lester and Nancy Sadler (Doc. 127) are each denied, with the specific exception of the hard-copy patient files noted above.

SO ORDERED.

DATED: January 17, 2012          s/Sandra S. Beckwith
                                 Sandra S. Beckwith
                                 Senior United States District Judge