```
              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF OHIO
                    WESTERN DIVISION
```

United States of America,        :   Case No. 1:10-CR-098
                                 :
    Plaintiff,                   :
                                 :
vs.                              :
                                 :
Nancy Sadler and Lester Sadler,  :
et. al.,                         :
                                 :
    Defendants.                  :

**ORDER**

Defendants Nancy Sadler and Lester Sadler have filed a joint post-verdict motion for acquittal or, in the alternative, a new trial. (Doc. 236) The Government opposes their motion (Doc. 239).

Following a three-week trial, the jury returned verdicts of guilty against both Nancy Sadler and Lester Sadler of conspiracy to distribute controlled substances (Count 1); unlawfully maintaining premises for the purpose of distributing controlled substances (Count 2); and for engaging in a continuing criminal enterprise (Count 29). Nancy Sadler was convicted on Counts 27, wire fraud, and Count 29, money laundering. Both of the Defendants were found not guilty on Counts 3 through 26, each of which alleged distribution of controlled substances on specific dates alleged in each count. Defendants moved for acquittal on

all charges at the close of the Government's case in chief, and renewed their motions prior to submitting the case to the jury. The Court took their oral motions under advisement.

Motion for Acquittal

Pursuant to Fed. R. Crim. Proc. 29(a), the Court may grant an acquittal if "the evidence is insufficient to sustain a conviction." In considering a motion for acquittal, the Court must review the evidence in the light most favorable to the prosecution, "... giving the prosecution the benefit of all reasonable inferences from the testimony." United States v. Graham, 622 F.3d 445, 448 (6th Cir. 2010)(internal citation omitted); United States v. Gibson, 409 F.3d 325, 332 (6th Cir. 2005). The Court may not make its own determinations about the credibility of trial witnesses, or the weight that should be given to any of the evidence that was before the jury. The Court's task is to determine whether a rational juror could have found the defendant guilty of the essential elements of the offense of conviction beyond a reasonable doubt. The Defendants bear a heavy burden in satisfying this standard. United States v. Graham, 622 F.3d at 448, quoting United States v. Abboud, 438 F.3d 554, 589 (6th Cir. 2006).

1. Conspiracy

The Court instructed the jury that in order to convict either of the Defendants on the charge of conspiracy to

distribute controlled substances, the Government must prove: (1) an agreement between two or more persons to unlawfully distribute controlled substances; (2) the distribution or dispensing of the controlled substances was not for a legitimate medical purpose, or was outside the scope of medical practice; and (3) that the defendant knowingly and voluntarily joined the conspiracy. Nancy Sadler argues that the indictment alleged two potential overt acts she committed in furtherance of a conspiracy: paragraph 85 alleges that she ordered quantities of several controlled substances (primarily oxycodone or hydrocodone) from 2003 to 2007, and paragraph 86 alleges that she sold 40,200 dosage units of drugs to David Michael Journey for $20,000. She claims that the only evidence introduced at trial connecting her to the orders for the drugs or the unlawful sale was David Michael Journey's own testimony. She notes that the jury must have disregarded Journey's testimony with respect to Counts 3 through 26 (the individual distribution counts alleged against both Defendants), because the jury acquitted Nancy Sadler of all of those counts. She asserts that Journey's testimony was "fatally compromised," because she produced "uncontroverted evidence" that the written orders for the controlled substances that were faxed to the distributors were authored by Gidget Coleman, and not by Nancy Sadler. As a result, she contends that Journey's testimony is insufficient as a matter of law to support the conspiracy

verdict.

Similarly, Lester Sadler argues that the only overt act alleged against him in the indictment is in paragraph 85, the orders for 219,860 dosage units of controlled substances. Journey's testimony did not directly implicate Lester Sadler in the ordering of those drugs, and he contends that there was no evidence offered suggesting that he was even aware that drugs were ordered, much less being unlawfully sold by Journey or anyone else connected to the clinic.

In <u>United States v. Graham</u>, <u>supra</u>, cited by the Sadlers, the Sixth Circuit affirmed the defendant's conspiracy conviction and noted: "It is not necessary that the government prove a formal agreement, and the existence of a conspiracy may be inferred from circumstantial evidence that can reasonably be interpreted as participation in a common plan. ...  A conspirator need not be an active participant in every phase of a conspiracy, so long as he is a party to the general conspiratorial agreement."  <u>Id</u>. at 449 (internal citations omitted).  <u>Graham</u> further confirms that proof of overt acts is not required in order to prove a conspiracy. <u>Id</u>. at 450, citing <u>United States v. Gibbs</u>, 182 F.3d 408, 420 (6th Cir. 1999).

The government argues that the testimony of the witnesses and the exhibits admitted at trial are more than sufficient to support the conspiracy convictions of both Defendants.  The

-4-

evidence adduced at trial included evidence showing that the Sadlers opened and operated the clinic, and paid all of the expenses for the clinic.  They hired and paid the physicians that worked at the clinic, and paid for the quantities of prescription drugs ordered from several distributors.  Large quantities of clinic records were found in the Sadlers' home during the search. Dr. Paul Duncan testified that he interviewed with Lester Sadler for a position at the clinic, but told Sadler that he did not yet have his DEA registration.  Sadler told Duncan that Sadler would advance the cost for Duncan to obtain his registration.  Duncan described visiting the clinic and observing Dr. Brumfeld, who was then working at the clinic.  Duncan testified that all of the patient chart documents were filled out by assistants and not by the physician, including the history and physical exam data. Duncan did not observe the availability of any commonly used treatment modalities for chronic pain, such as joint injections or TENS units.  Patients simply received prescriptions for pain medications.  Dr. Rakowsky worked for Nancy Sadler for about four months before Dr. Banks arrived.  He testified that he saw 20 to 25 patients per day, and said that a high percentage of them paid in cash.  The clinic used his DEA registration number to order prescription medications.

The landlord for the clinic's W. Emmitt Avenue location in Waverly testified that he received rent checks drawn on accounts

held by the Sadlers, including in the name of one of their businesses called Health Solutions Plus. He described some complaints from his other tenants about the clinic's clientele and their behavior. One of those tenants was Deanita Reilly, the manager of a dollar store that operated out of the strip mall next door to the clinic. She testified that people would wait in the parking lot to get into the clinic, typically several people arriving in one car, and that out of state license plates were very common. She called the police several times to complain about some of these individuals shoplifting from her store.

Connie Shy worked at several clinic locations for the Sadlers. Shy testified that she and Nancy Sadler filled out the forms necessary to establish an account with Allscripts, one of the drug distributors used by the clinic beginning in 2002. (Trial Ex. 27) Shy described Nancy Sadler as being "in charge" of the clinic during the time that Shy worked at the Waverly location. Shy left sometime in 2003, at about the time that local pharmacies began refusing to fill prescriptions written by the clinic's physicians.

Peggy Fegley also worked for the Sadlers. She testified about the process they used to fill out "day sheets" for patient appointments, typically two or three weeks in advance of the patient's scheduled visit. Nancy Sadler would arrive at the clinic and announce that "it was time to do the charts," which

meant it was time to complete day sheets and chart entries far in advance of patient appointments.  Fegley also testified that the clinic received many phone calls asking for "Marie," which was a name that both Nancy Sadler and Gidget Coleman used.  Fegley said that Sadler and Coleman would laugh about these calls.

Becky Adams, Peggy Fegley's daughter, worked at the clinic as an "assessor;" she was hired by Nancy Sadler although Adams lacked any medical training.  "Assessors" were supposed to assess a patient's status before being seen by a physician.  Adams also described completing "day sheets" far in advance of client visits.  And Fegley testified that some of the "assessors" created charts for people who were not clinic clients, at the instruction of Nancy Sadler and David Journey.  Shane McNutt, a friend of the Sadlers' son, worked for the Sadlers in their pizza business until it closed.  Nancy Sadler then hired him to work in the clinic's assessment room.  McNutt said he received on the job training from Nancy Sadler, Peggy Fegley, Becky Adams and others on how to fill out the day sheets; McNutt lacked any medical training.

David Michael Journey testified that he created a chart for his wife, Jackie, and for his son by using their identification. He then obtained prescriptions written in their names, which he used to obtain pills to sell on the street.  Jackie Journey is Lester Sadler's sister, and Peggy Fegley is David Journey's

sister.  David Journey asked Fegley and Becky Adams (his niece) to sell him pills that they were prescribed but did not use, and they did so.  Journey sold those pills on the street.

Lisa Clevenger, Nancy Sadler's sister, also worked on and off at the Sadlers' clinic from 2002 through 2010 when the clinic was closed.  She said that up to 100 patients per day were seen, and that patients would often arrive before the clinic opened for the day, and wait in the parking lot.  Drugs and some patient files were kept in a large safe on the premises, and the only people with access to the safe were the Sadlers, Sandy Wells, and David Journey.  Clevenger confirmed the testimony of other employees that day sheets were filled out in advance, and were fairly standardized.  She identified several exhibits containing Nancy Sadler's handwriting, including a check (Trial Ex. 35 at p. 54); a letter to a distributor (Ex. 37); and a handwritten letter about the clinic business' new name (Ex. 81).  Clevenger also testified that while she worked at the clinic, Nancy Sadler did the payroll and Lester Sadler actually handed out the checks to employees.  Agent Kinneer from the Ohio Board of Pharmacy testified that the Sadlers never applied to open a licensed dispensary at the clinic.  A state dispensary license is required in order to legally dispense controlled medication at a clinic.

The Court concludes that there is abundant evidence in the record supporting the jury's verdict that both of the Defendants

were engaged in the conspiracy. The quantities of drugs that the Sadlers ordered, as shown in the invoices and payment records that were admitted at trial, show that the pattern of ordering these drugs began before David Michael Journey started working for the Sadlers at the clinic. The Government argues that the Sadlers set up the clinic and the procedures necessary to obtain quantities of controlled substances; without their actions, there would have been no opportunity for Journey to engage in his own admittedly unlawful activities at the clinic.

The Sadlers' attacks on David Michael Journey's credibility are not a basis upon which this Court could grant an acquittal. As the Sixth Circuit emphasized in Graham:

> We may not rule on a challenge to witness credibility in reviewing the denial of a motion for acquittal because doing so would invade the province of the jury as the sole finder of fact in a jury trial. ... A defendant's attempt to attack witness credibility simpl[y] challenges ... the quality of the government's evidence and not the sufficiency of the evidence.

Graham, 622 F.3d at 449 (internal citations and quotations omitted). Journey admitted his involvement in procuring the prescriptions that form the basis for Counts 3 through 26 of the indictment, prescriptions that were written in the names of several of his family members. The fact that the jury acquitted the Sadlers on these specific distribution counts does not compel a conclusion that the jury was required to reject all of

-9-

Journey's testimony, as the Sadlers suggest. The Court instructed the jury that they were entitled to believe part, all, or none of the testimony of any trial witness.

Viewing all of the evidence and testimony presented at trial in the light most favorable to the government, the Court concludes that there is more than sufficient evidence to support the jury's conspiracy verdicts against both of the Defendants. The government is not required to prove the existence of a formal agreement to conspire, and the existence of a conspiracy may be inferred from circumstantial evidence that can reasonably be interpreted to show a defendant's participation. See United States v. Avery, 128 F.3d 966, 970-971 (6th Cir. 1997). The jury was entitled to conclude that the Sadlers knew that the primary purpose of operating the clinic was to make money by unlawfully dispensing prescriptions and pills to individuals outside of the scope of a legitimate medical practice, and that they agreed with others to engage in that conspiratorial undertaking.

2. Maintaining Premises for the Purpose of Unlawful Distribution of Controlled Substances

Both Defendants were found guilty of Count Two, maintaining the clinic premises for the purpose of unlawful distribution of controlled substances. The applicable statute prohibits knowingly using or maintaining a place "for the purpose" of distributing controlled substances; see 21 U.S.C. §856(a)(1). Defendants cite United States v. Russell, 595 F.3d 633, 643 (6th

Cir. 2010), which held that the government must prove that the drug-related purpose was a "significant or important" reason for using or maintaining the premises.

Defendants initially contend that the jury was not instructed on the meaning of the phrase "for the purpose." The Court notes that Defendants did not object to this portion of the instruction, nor offer any additional instruction to further define the phrase. Moreover, the phrase "for the purpose" is not technical or specialized. Webster's Ninth New Collegiate Dictionary defines "purpose" as "something set up as an object or end to be attained." The word is not ambiguous and in the Court's view, needs no further definition.

Defendants then argue that the government's trial evidence largely dealt with the manner in which they operated the clinic, such as the large volume of patients seen, or the fact that most patients were given prescriptions for pain medication and paid for services in cash. Defendants again rely on the not guilty verdicts on the individual distribution counts to argue that Journey's testimony (that Nancy Sadler knew he was selling the drugs obtained through the clinic, and that he split the proceeds with her) is insufficient to show that the "significant or important" reason the Sadlers opened the clinic was to illegally distribute or dispense controlled substances.

As with their arguments regarding the conspiracy verdicts,

the Sadlers ignore the bulk of the evidence introduced at trial regarding the orders for controlled substances, the mass-produced features of patient charts, the remarkable similarity of the regimen of drugs prescribed and dispensed to clinic clients, and the character of the clientele as described by neighboring tenants and by pharmacists who refused to fill their prescriptions.  The Sadlers could not have obtained access to prescription medication from distributors without a physician's DEA registration number.  Their establishment and operation of the clinic and the hiring of physicians to work there enabled the orders to be filled.  There was sufficient evidence to support the jury's conclusion that the Sadlers were maintaining the clinic premises "for the purpose" of unlawfully dispensing and distributing controlled substances.

3.   <u>Wire Fraud</u>

The jury convicted Nancy Sadler of wire fraud, as charged in Count 27 of the indictment, alleging that on March 8, 2006, she ordered 40,200 dosage units of hydrocodone from GIV, the distributor, and paid for them using an electronic bank funds transfer of $3,956.12.  She argues that GIV's representative, Terry Gwyn, testified that anyone could order from his company so long as they provided a valid DEA registration number, and nothing in his testimony suggested that Nancy Sadler made any false representations to GIV about why the pills were ordered.

-12-

She cites the testimony of her handwriting analyst, David Hall, who opined that some documents sent to GIV were written by Gidget Coleman, not by Nancy Sadler.  And she relies on bank records introduced at trial, showing that she was at an Indiana casino on many of the dates that drug orders were placed, making it impossible for her to have physically signed or approved orders on those dates.

The elements of wire fraud are that the defendant devised or willfully participated in a scheme to defraud; that the defendant used or caused to be used an interstate wire communication in furtherance of that scheme; and that the defendant intended to deprive a victim of money or property.  United States v. Faulkenberry, 614 F.3d 573, 581 (6th Cir. 2010), citing United States v. Prince, 214 F.3d 740, 748 (6th Cir. 2000).  The "scheme to defraud" in this case which the government alleged against Nancy Sadler was the scheme to open and operate the clinic in order to unlawfully dispense and distribute controlled substances.  The orders that were successfully placed with GIV were a critical part of that scheme.  Payment for those orders using an interstate wire communication was clearly done "in furtherance of" that scheme.  The third element of wire fraud requires proof of the intent to deprive a victim of money or property.  While it is clear that the Sadlers paid the **distributor** for the drugs, the drugs were obtained under false

pretenses: the drugs furthered the overall fraudulent scheme to illegally obtain and dispense controlled substances.

In Faulkenberry, the defendant was an officer at NCFE who was charged (along with several other NCFE officers and directors) with engaging in a massive fraudulent scheme that ultimately cost NCFE investors over $2 billion.  He was convicted on several counts of securities and wire fraud, and moved for an acquittal.  With respect to wire fraud, he argued that he did not send any communications to any NCFE investor.  But the government relied on a facsimile with an attached phony receivable report that had been sent to the trustee for some of NCFE's investor trusts.  There was no evidence that Faulkenberry personally sent that facsimile, but there was evidence that he caused it to be sent.  He also argued that the facsimile was not "in furtherance of" the scheme to defraud investors, because the facsimile did not directly cause anyone to invest additional sums in NCFE.  The court rejected his argument because the false report to the trustee had a lulling effect on the trustee, and ultimately on the investors, which was sufficient to satisfy this factor. Finally, there was overwhelming evidence that Faulkenberry intended to defraud the ultimate victims, the investors, even though he had not directly communicated with them.

Here, similarly, there is no direct evidence that Nancy Sadler personally arranged the details of the wire transfer of

-14-

funds to pay for the specific dosage units ordered in March 2006. But there is abundant evidence that she knew of and willingly participated in the fraudulent scheme to obtain prescription drugs that was launched some years before, and set up the payment system for those orders.

Mr. Hall, Defendants' handwriting expert, testified that in his opinion, Defendants' Exhibits E-1, E-3, E-4, and E-6 were written by Gidget Coleman and not by Nancy Sadler. These exhibits contain communications with GIV by facsimile and in a letter signed by Dr. Banks in August 2007, after GIV questioned the purpose for the controlled substances that the clinic had recently ordered. Even if the jury accepted his testimony regarding these exhibits, this would not compel a conclusion that Nancy Sadler did not order controlled substances from GIV on the dates alleged in the indictment, or as reflected in the numerous invoices documenting hydrocodone ordered for shipping to the clinic, with the Sadlers' home address used as the billing address. (See Trial Ex. 31, GIV invoices from February 2006 through April 2007.) The GIV customer profile (Trial Ex. 30) states that "Maria Meyers" was the clinic's purchasing agent, and the invoices all list "Marie" as the person who placed the order. And the invoices from Allscripts, another distributor from whom the Sadlers ordered drugs, reflect that orders placed from December 2004 through the end of 2006 were also placed by "Marie"

or "Maria" and at least one by "Gidget."  (Trial Ex. 28)  The jury was entitled to accept Paula Fegley's testimony that both Nancy Sadler and Gidget Coleman used the name "Marie," and to conclude based on all of the evidence that Nancy Sadler devised or willfully participated in the scheme to obtain the controlled substances.

Finally, the fact that Nancy Sadler may have spent a good deal of time at an Indiana casino during the time that David Michael Journey worked at the clinic does not preclude the jury from finding that she devised or was a willing participant in the scheme to obtain additional quantities of pain medications, including the order in March 2006.  As the Government argued to the jury and repeats in its opposition memorandum, telephones provide ready communication between Waverly, Ohio and southern Indiana.  The Government was not required to provide that Nancy Sadler personally signed every order for controlled substances in order to prove that she was a willing participant in the scheme.

4. <u>Money Laundering</u>

The jury also found Nancy Sadler guilty of money laundering charged in Count 28 of the indictment, pursuant to 18 U.S.C. §1956(a)(1)(B)(ii).  The government charged that Nancy Sadler used proceeds from the scheme to distribute controlled substances to purchase an automobile from a Columbus dealer, and arranged that purchase to avoid a transaction reporting requirement.

-16-

Trial Exhibit 78 includes five different checks that Nancy Sadler used to pay the Pontiac dealer for the automobile in question, the total price of which was approximately $29,000. Three checks were drawn on three different accounts with Charter One Bank, two cashier's checks and one handwritten check drawn on a joint account held in the name of Lester and Nancy Sadler. A fourth check was drawn on a US Bank account, and a fifth check was drawn on an Oak Hill Banks account. Each check was made payable to the car dealer; Sadler also paid the dealer $1,500 in cash. Trial Ex. 79 includes deposit tickets for the cash used to obtain the cashier's checks drawn from Charter One bank. Nancy Sadler did not testify about why she chose to pay for the automobile in this somewhat unusual manner. Sadler's attorney suggested several innocent explanations for the way in which she structured this transaction, but the jury was not required to accept these explanations.

Money laundering requires the government to prove that the money involved in the transaction was in fact proceeds of a specified unlawful activity. Nancy Sadler argues that the only evidence introduced at trial on this issue came from David Michael Journey, who testified that he paid Sadler cash he obtained from his illegal sales of pain medications obtained through the clinic. And as with the other counts, Nancy Sadler contends that Journey's testimony alone is insufficient to

-17-

support her money laundering conviction because Journey's testimony was not credible.  But the jury was entitled to accept Journey's testimony that he paid Sadler in cash during this time period.  Moreover, as already noted, attacks on witness credibility are not a proper basis for an acquittal.  Nancy Sadler was ultimately unsuccessful in avoiding the reporting requirement, because the car dealer filed the required disclosure form with the Internal Revenue Service.  But that does not compel the conclusion that she did not intend to conceal the source of the funds by structuring the transaction to avoid that requirement.

The Court concludes that there is sufficient evidence to support the jury's verdicts against Nancy Sadler on Counts 27 and 28, and denies her motion for acquittal on those counts.

5.   Continuing Criminal Enterprise

The jury found both Defendants guilty of violating 21 U.S.C. §848, engaging in a continuing criminal enterprise alleged in Count 29.  This offense requires proof that each defendant committed a felony narcotics offense which is part of a series of three or more felony drug offenses.  The Government concedes that neither of the Defendants has been convicted of three predicate narcotics offenses.  Therefore, without objection from the Government, the Defendants' motion for acquittal is granted solely with respect to Count 29 as to Nancy Sadler and Lester

Sadler.

## CONCLUSION

For all of the foregoing reasons, the Defendants' joint motion for acquittal under Rule 29 (Doc. 236) is denied with respect to their convictions for conspiracy and for maintaining a drug premises, Counts 1 and 2, and Nancy Sadler's convictions for wire fraud and money laundering, Counts 27 and 28.  The motion is granted as to both Defendants with respect to Count 29, engaging in a continuing criminal enterprise.

    SO ORDERED.

DATED: August 15 2012        s/Sandra S. Beckwith
                                      Sandra S. Beckwith
                                      Senior United States District Judge